**FILED**

DEC 2 9 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By _____ Deputy

Mark C. Manning
Mark C. Manning, P.C.
431 West 7th Ave, Suite 204
Anchorage, AK 99501
(907) 278-9794; fax: 278-1169
Counsel for Plaintiff Bear Tooth LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

|  |  |
|---|---|
| In the Matter of ) | |
| the Complaint of ALASKA MARINE ) | |
| TRANSPORT & SALVAGE, INC., as ) | |
| Owner of the M/V POLAR BEAR, ) | |
| OFFICIAL No. 974480, for Exoneration ) | In Admiralty |
| From or Limitation of Liability. ) | |
| ) | Case No.: A00-157 CV (HRH) |

In the Matter of
the Complaint of ALASKA MARINE
TRANSPORT & SALVAGE, INC., as
Owner of the M/V POLAR BEAR,
OFFICIAL No. 974480, for Exoneration
From or Limitation of Liability.

In Admiralty

Case No.: A00-157 CV (HRH)

### OPPOSITION TO PETITIONER'S SUMMARY JUDGMENT MOTION

### FACTS

Plaintiff Bear Tooth, LLC, is a limited liability company formed under the laws of Wyoming. Exhibit BT-A, Hobler deposition at 9:17 to 11:5 & 36:7-10. Peter Hobler held the majority interest and his brother the minority. *Id.* Bear Tooth's business was limited to investing in an Alaska gold mining venture involving Richard Shell. *Id.* Hobler's cousin told him about a potential project, and put him in touch with Shell. *Id.* at 22:4-23:16. Shell and Hobler first met in St. Louis in late spring or early summer 1998. *Id.* The initial project they discussed involved purchasing a small dredge named Nessie, and mining at Bear Creek outside of McGrath, Alaska. *Id.* at 24:2-25:7. Among other things, funds were needed to purchase Nessie. *Id.*

Bear Tooth entered into an agreement to provide $400,000.00 for the purchase and refurbishing of the dredge Nessie. *Id.* at 44:5-45:13. The venture was not fruitful, reportedly

138

because the dredge's nozzle was not large enough, and so could not deal with large rocks and boulders. *Id.* at 45:14-47:19; Exhibit BT-B, Shell deposition at 128:14-130:17 & 134:24-135:24. Consequently, the Bear Creek effort ended in the fall of 1998. Exhibit BT-A at 47:11-19.

Shell and Hobler then began to discuss acquiring a 14-15" dredge. *Id.* 47:20-48:8. They entered into a new agreement concerning this dredge in early 1999. *Id.* at 50:12-23. Shell sent Hobler photographs of the dredge and they discussed the potential cost of purchasing and refurbishing the dredge. *Id.* at 51:23-52:11. Shell purchased the dredge from the land owner for $75,000.00, and later told Hobler that he had done so. Memorandum Supporting Summary Judgment motion at 4; Exhibit BT-A at 52:25-54:5. Bear Tooth provided those funds. Exhibit BT-A at 52:25-54:5.

When it was salvaged, the dredge was situated on the side of a pond on private property near Yreka, California. Exhibit 9, Shell depo. at 50:14-22; Exhibit BT-C, Nowak declaration at ¶¶ 2&3. The property was on the Klamath River, but the dredge itself was not on or in the river, nor on or in the river's bed. Exhibit BT-C at ¶ 3. The dredge remains had to be recovered from muck, and trucked to a firm called Jesse Engineering in Tacoma, Washington, for refurbishment. Exhibit 9 at 50:23- 51:1, 65:17-24 & 70:4-72:4; Exhibit BT-C ¶¶ 2&3. Jesse Engineering carried out extensive refurbishment. BT-B, Shell depo. at 147:25-152:13. Hobler visited the refurbishment project in Tacoma twice, first in mid- to late spring 1999 and again mid- to late summer 1999, by which time the refurbishment was complete. Exhibit BT-A at 55:2-19, 56:8-57:21.

The dredge was eventually transported to Anchorage. Exhibit BT-B at 159:19-162:4. As Petitioner Alaska Marine Transport ("AMT") writes, the dredge was then loaded onto a barge and, while the barge and its cargo were under tow by Petitioner's vessel on December 1, 1999, the POLAR BEAR, the tow line parted and the barge went on the strand. The dredge was lost. At that point, in addition to its $400,000.00 investment in the Nessie venture, Bear Tooth had invested approximately $1,105,000.00 in the second dredge venture, and subsequently spent more than $50,000.00 in additional costs that came in. Exhibit BT-D.

## ANALYSIS

### I. PETITIONER'S RELIANCE ON THE ABANDONED SHIPWRECK ACT TO SHOW THE ABSENCE OF A LEGAL INTEREST MUST FAIL FOR LACK OF AN ESSENTIAL FACTUAL PREDICATE.

The dredge at issue was situated on the side of a pond on private property near Yreka, California. Exhibit 9, Shell depo. at 50:14-22; Exhibit BT-C, Nowak declaration at ¶¶ 2&3. The property was on the Klamath River, but the dredge itself was not on or in the river, nor on or in the river's bed. Exhibit BT-C at ¶ 3. Shell has testified that he purchased the dredge at issue from the landowner for $75,000.00. Exhibit 9, Shell depo. At 54:3-23.

AMT claims that Shell could not have acquired title because the dredge had been abandoned and lay embedded in the bottom of the Klamath River, vesting title in the State of California by operation of the Abandoned Shipwreck Act of 1987. 43 USC §§2101 *et seq.* AMT's motion must fail on this point because the Nowak declaration shows that "the statutory requirement that the wreck be in State navigable waters" is not met in this case. MEMORANDUM SUPPORTING SUMMARY JUDGEMENT MOTION, at 7. AMT does not cite any evidence that the dredge was salvaged from the bed of the Klamath River. AMT cites Exhibit 9 to support its assertions that the dredge was "on" or "along" the Klamath River, without citing any specific testimony. *Id.* at 4. Review of Exhibit 9 finds no question to Shell that would have established whether the dredge was lying in Klamath River riverbed or in some other ground. The only reference to anything being "on" the Klamath River is Shell's testimony locating the town of Yreka on the Klamath. Exhibit 9, 50:14-22. In ordinary English usage, towns, which of course typically cover a large surface area, are spoken of as being "on" a river when they occupy ground that has some degree of proximity to the river. In no sense of the word does "on" mean the town is embedded in the river bottom.

Likewise, AMT's assertion that "Shell testified that the dredge was stuck in the river bottom" is absolutely unsupported. MEMORANDUM SUPPORTING SUMMARY JUDGEMENT MOTION, at 7. AMT leaps to the conclusion that the "muck" Shell said the dredge was extracted from was Klamath River muck, when it fact is was pond muck. Exhibit

BT-C ¶¶ 2&3.

Even if AMT had adduced some evidence that the dredge was embedded in the Klamath River bottom, the Nowak declaration would raise a genuine issue of material fact on the crucial issue of whether the dredge was embedded in a navigable waterway. This issue would preclude summary judgment. Fed. R. Civ. P. 56©; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Bear Tooth notes further that AMT's argument also fails because it does not make any showing that Shell's seller had no power to convey the dredge. Even if title to the dredge had at some point been in the State of California, it does not follow that title did not pass to the landowner subsequently. So at best for AMT, its motion on this point would establish a point of irrelevant historical interest.

Finally, if AMT were to establish that Shell did not gain title to the dredge, a finding that is not possible on the present record, Bear Tooth would request that the case be allowed to proceed in trust for the State of California. The fact is that the dredge was junk when it was recovered and transported to Jesse Engineering for refurbishment. Bear Tooth's funds resulted in restoration that added a great deal of value to the dredge. It is also a fact that an expensively acquired, refurbished and transported piece of equipment was lost while it was in AMT's care. Regardless of who owned the dredge, it is undisputed that AMT contracted with Shell to tow it to Sitkanak Island. AMT breached that contract, and negligently lost the dredge. AMT has cited no precedent that holds that the party with which it contracted has no claim merely because the latter did not hold title to the property AMT contracted to transport. It would do neither the State of California, Bear Tooth nor Shell any service to allow AMT to escape responsibility for the loss on the theory AMT urges. By far the better policy would be to allow recovery, which could then be apportioned among the interested parties in accord with applicable legal and equitable principles.

## II.    THE NATURE OF THE DREDGE VENTURE DOES NOT EXCUSE PETITIONER FROM LIABILITY.

AMT offers the astonishing assertion that it should be excused from a claim for negligently losing an expensive piece of equipment because Shell was using that equipment

to wrongfully fleece Bear Tooth, the entity who funded the acquisition, refurbishment, transportation and deployment of that equipment. Unsurprisingly, AMT cites no decisional law to support its proposition. Rather, it resorts to the tactic of parties bereft of an analytically sound position: it cites broad legal principles hoping the court, which AMT has left in an analytical vacuum, will apply them far beyond their proper scope.

Bear Tooth notes first that, while AMT carelessly characterizes the venture in question as a "scam" and "fraud," it offers no admissible evidence that that was what occurred. The intended activity in question was the acquisition, refurbishment, transportation, deployment and operation of a gold dredge originally constructed by a third party in the '80's. The remains of old gold dredges scattered around Alaska testify to this well-established means of pursuit of gold extraction. There is no basis for finding that this is the type of activity with respect to which courts will not enforce contracts.

AMT urges the court not to hold it responsible for negligently losing an expensive dredge on the ground that Shell allegedly raised money for the venture from Bear Tooth in an unlawful fashion. First, AMT has not shown that occurred. Merely referring to historical matters unrelated to the one at issue does not establish the character of the latter. Second, even if Shell had raised funds from Bear Tooth improperly, that does not change the lawful character of the mining venture Shell and Bear Tooth were prosecuting. AMT has offered absolutely no support for the proposition that the unlawful raising of money to prosecute an otherwise lawful activity justifies excusing all those who contract to support the lawful activity from liability for breach of contract, let alone tortious injury.

Bear Tooth notes second that the law upon which AMT relies concerns the enforcement of contracts. Yet, though this claim results from AMT's contract to tow the HOME BAR 1 and the dredge, the claims for loss of the barge and dredge are in tort. Alex L. Parks & Edward V. Cattell, Jr., The Law of Tug, Tow and Pilotage at 18-19 (2d ed. 1994) Exhibit BT-E. Again, AMT offers absolutely no authority for the notion that a party that tortiously destroys property need not pay for the loss, regardless of whether the property is being used for a lawful purpose at the time of loss or of whether the money to buy the property was raised lawfully.

To apply such a rule in this case would produce an egregious result. If AMT's characterization of Shell's activities were accurate, Bear Tooth would have been Shell's victim, the party the laws and orders to which AMT refers were intended to protect. Bear Tooth, the innocent party whose investment was ruined when AMT lost the dredge, is the party with the primary interest in this claim. *See* Petitioner's Exhibits 5 & 8; Exhibit BT-F, Manning Declaration. If AMT were given license to destroy the dredge, Bear Tooth would primarily bear the economic consequences.

Thirdly, regardless of the character of Shell's conduct, AMT's engagement to transport the barge and dredge from Anchorage to Sitkanak Island was a lawful contract that was only incidentally connected with the activity. Therefore, the rule AMT asserts could not apply, even if it were to apply to tort claims. 17A Am. Jur. 2d Contracts §§ 244, 311 (2d ed. 1991).

## CONCLUSION

Bear Tooth respectfully submits that AMT's motion must be denied.

DATED this 29th day of December, 2005.

MARK C. MANNING, P.C.
Counsel for Bear Tooth LLC


By: _____
        MARK C. MANNING

6