# EXHIBIT 2

Case 3:00-cv-00157-HRH   Document 146-3   Filed 02/03/2006   Page 1 of 5

COPY

```
 1                  UNITED STATES DISTRICT COURT
 2                       DISTRICT OF ALASKA
 3
 4                                    )
 5                                    )
 6                                    ) In Admiralty
 7                                    )
 8                                    ) Case No.:A00-157 CIV (HRH)
 9    In the Matter of                )
10    the Complaint of ALASKA         )
11    MARINE TRANSPORT & SALVAGE      )
12    INC., as Owner of the           )
13    M/V POLAR BEAR,                 )
14    Official No. 974480, for        )
15    Exoneration From or             )
16    Limitation of Liability.        )
17
18
19
20         Deposition of PETER HOBLER,  March 13, 2002, taken
21    by the Defendant at Snake River Lodge, Teton Village,
22    Wyoming.
23
24                  JACKSON HOLE COURT REPORTING
25                        307 733-2637
```

38

1 initial meetings I might have questions here and there
2 about different aspects of the venture.
3  Q. Do you recall what aspects that you were
4 questioning?
5  A. Trying to learn more about mining. I would
6 ask him if he might have information he could send me.
7 He would send me articles and general information like
8 that.
9  Q. Did he provide any such material to you?
10  A. Infrequently, yes.
11  Q. Did there come a time you met face to face
12 again with Mr. Shell?
13  A. Yes.
14  Q. When did that first happen?
15  A. I don't recall if that was again in St. Louis
16 or possibly in Scottsdale because I have been there
17 several times to meet with him. The timing would have
18 been within the next few months.
19  Q. Then within the next few months?
20  A. After the initial meeting.
21  Q. Do you recall the substance of that meeting?
22  A. We began to talk I believe about a possible
23 agreement and the details of such.
24  Q. But you don't recall whether it was in
25 Scottsdale or St. Louis?

39

1  A. No, I do not.
2  Q. Do you recall if anyone else participated in
3 that meeting?
4  A. I don't believe, I think it was just the two
5 of us.
6  Q. Did you take notes of that meeting?
7  A. I would have to go through my notes and
8 check. And I tend to take notes, so I very well may
9 have.
10  Q. Did you have a practice of taking notes of
11 your conversations with Mr. Shell?
12  A. Not telephone conversations, no.
13  Q. Did you take notes of the first meeting with
14 him?
15  A. I believe so.
16  Q. Do you still have those today?
17  A. I don't know that. I would have to look.
18    MR. KEOUGH: We'll ask for the production of
19 those as well.
20  Q. After your discussion with him immediately
21 following the report from Paladin what was the next
22 thing that you did with respect, at all in any respect
23 regarding this mining venture that he was proposing?
24  A. I believe I talked to Pat McKeown who seemed
25 to have some knowledge of the situations since he had

40

1 put together the Bear Creek proposal. I'm trying to
2 recall what else.
3  Q. Where is Mr. McKeown located?
4  A. Out of the Milwaukee I believe.
5  Q. Did you ever meet face to face with him
6 following the first meeting?
7  A. We may have met one other time. I don't
8 specifically recall.
9  Q. Did he provide any material to you?
10  A. Other than the proposal I don't believe so, I
11 don't know.
12  Q. When was the last time you spoke with him?
13  A. It's been a long time. Sometime either late
14 1998 or early 1999.
15  Q. Other than speaking with Mr. McKeown, what
16 other steps or activities did you take with respect to
17 this project?
18  A. I looked over the materials more closely.
19 Several individuals whose names Mr. Shell had given me,
20 I talked to them for a reference aspect.
21  Q. Who were those people?
22  A. If I remember the names one would be Jerry
23 Newman. One would be Jim Barkowsky. One would be Jim
24 Halloran.
25  Q. Who would you -- go ahead.

41

1  A. I believe that's it.
2  Q. Who did you understand Mr. Newman to be?
3  A. Business associate of banking background, was
4 an associate of Mr. Shell.
5  Q. Did you meet with him or speak with him by
6 phone?
7  A. Initially, phone.
8  Q. And did there come a time when you actually
9 met him face to face?
10  A. Yes.
11  Q. When was that?
12  A. That would have been in Tacoma when I first,
13 I believe it was the first visit I went to actually see
14 the progression of the refurbishing of the dredge.
15  Q. Do you recall when that took place?
16  A. I believe sometime in 1999, say spring of
17 1999 would be my guess.
18  Q. That's your best recollection of it?
19  A. Yes.
20  Q. Where is Mr. Newman based?
21  A. I believe he's based in Wichita, Kansas.
22  Q. Who did you understand Mr. Barkowsky to be?
23  A. The land owner of Bear Creek.
24  Q. Where is he based?
25  A. I'm not sure of that. I want to say possibly

42

1  Minneapolis.
2  Q. Did you ever meet face to face with him?
3  A. No.
4  Q. What did Mr. Newman tell you about Mr. Shell
5  and his project?
6  A. Basically he vouched for his character, that
7  he had known him, I don't remember the time frame, but
8  a fairly long time, say at least ten years. And that
9  they had talked about various mining ventures
10 previously.
11 Q. What did Mr. Barkowsky say about him and his
12 project?
13 A. Basically that he owned the land and --
14 Q. He meaning Bartkowsky?
15 A. That Barkowsky owned the land, correct, and
16 he had known Shell for a long time also.
17 Q. And what did Mr. Halloran tell you about Mr.
18 Shell and his project?
19 A. Pretty much the same thing, that he had known
20 Mr. Shell for a long time and he, Jim Halloran, had
21 checked out the mineral aspects of at this point in
22 time Bear Creek and said it was a very rich mineral
23 deposit throughout the property.
24 Q. Did you take any other steps or do anything
25 else in connection with this proposal by Mr. Shell

43

1  following the Paladin report to you?
2  A. The only other step offhand that comes to
3  mind would be one of the individuals also I believe I
4  had checked by Paladin was Jim Halloran to make sure he
5  was a true geologist and was qualified to do the
6  checking of the land.
7  Q. And they reported to you that he was?
8  A. Yes.
9  Q. What is the next thing you did with respect
10 to this project?
11 A. I started to researching some books that I
12 have or had -- I don't know if I still have them --
13 various agreements. Talked to a friend of mine that
14 has good business background about potential
15 agreements, started to come up with details of a
16 potential agreement with Mr. Shell.
17 Q. Did you consult a lawyer to assist you with
18 respect to Mr. Shell's proposal?
19 A. I do not recall doing so, no.
20 Q. When is the next time you met Mr. Shell face
21 to face?
22 A. I don't recall the exact timing. I believe
23 that may have been in Scottsdale over the details of
24 the agreement.
25 Q. Did there come a point you reached an

44

1  agreement with Mr. Shell?
2  A. Yes.
3  Q. When did that take place?
4  A. I believe that was July of 1998.
5  Q. And at the time you reached that agreement,
6  was that a face-to-face meeting with him?
7  A. Not initially, no.
8  Q. You reached an initial agreement by phone?
9  A. Yes.
10 Q. What was the substance of that agreement?
11 A. The initial agreement, which was with Bear
12 Creek Mining, was I believe -- I think we just lost
13 him.
14
15    Short break.
16
17 Q. (BY MR. KEOUGH) Continuing.
18 A. The agreement was that Bear Tooth would
19 forward to Shell via Bear Creek 400 thousand dollars
20 for the purchase and refurbishing of an eight-inch
21 Nessie dredge to be used at Bear Creek, Alaska. And in
22 return for that I believe the first payout was supposed
23 to be 30 or 60 days later, I believe 150 thousand
24 toward the payback of the 400 thousand dollar
25 investment. Several other dates for the full

45

1  repayments of that. And a five percent millhead
2  royalty of all net profits to be forwarded on an annual
3  basis to Bear Tooth.
4  Q. And did that agreement change when you met
5  face to face with him?
6  A. No.
7  Q. Did you memorialize that agreement in
8  writing?
9  A. Yes.
10 Q. And did that take place at a face-to-face
11 meeting with him?
12 A. I don't believe so. I believe we did via
13 mail back and forth for the appropriate signatures.
14 Q. And what was the next thing that you did with
15 respect to this project after the agreement was reached
16 in July 1998?
17 A. Basically I believe to wait for the fruitful
18 efforts of the venture.
19 Q. And did that ever occur?
20 A. No.
21 Q. What was the next communication that you had
22 with Mr. Shell after the meeting, after the agreement
23 was reached?
24 A. I'm sure there were multiple communications.
25 As I mentioned we usually spoke almost every day just

134

1  bearing the control numbers RT700001 through 5. Ask
2  you if you recognize that?
3      A. Yes, I do.
4      Q. And what is that?
5      A. That was a subsequent funding agreement
6  between Bear Tooth and Shell Mining.
7      Q. This is what the agreement you described
8  earlier today in your testimony?
9      A. I described several agreements. This would
10 be one of them, yes.
11     Q. And the funding agreement states in the upper
12 left-hand corner states Final. Do you see that?
13     A. Yes.
14     Q. Now, was there any earlier draft version of
15 this agreement?
16     A. The way I normally do things when I do a
17 rough draft I have rough until the final version, and
18 then I have final. So yes, that suggests it was.
19     Q. Did you prepare this document?
20     A. Yes, I did.
21     Q. Did you maintain on your computer the earlier
22 drafts of this?
23     A. I don't know that. I would have to look.
24     Q. Or in your files?
25     A. Normally I don't maintain rough drafts, no,

135

1  but I could check.
2      Q. Is that your signature on the second page of
3  the document?
4      A. Yes, it is.
5      Q. And is that your brother's signature next to
6  yours?
7      A. Yes, it is.
8      Q. And do you recognize that as Mr. Shell's
9  signature?
10     A. As close as can be, yes.
11     Q. And did you sign that in the presence of Mr.
12 Shell?
13     A. I believe I did, yes.
14     Q. Where did that take place?
15     A. Would have been in Scottsdale.
16     Q. That would have happened on November 4, 1999?
17     A. I believe that is correct, yes.
18     Q. Did you consider the purpose of this
19 agreement, this funding agreement, was to protect your
20 funding or your interest in the funding that you had
21 provided to Mr. Shell?
22     A. Yes, I did.
23     Q. Now, the third page and subsequent pages in
24 the Exhibit refers to a collateral agreement between
25 Bear Tooth and Shell Mining; is that right?

136

1      A. That's correct.
2      Q. What was the purpose of that collateral
3  agreement?
4      A. To the best of my recollection the purpose
5  would have been to further protect me for the funds
6  that my brother and I had forwarded to Shell via Shell
7  Mining and Richalinda Trust to make sure we were
8  protected by placing the dredge as collateral for those
9  funds advanced.
10     Q. At that time did you ask Mr. Shell for any
11 evidence or any writing to indicate that he in fact
12 owned the dredge?
13     A. I believe I did.
14     Q. Did he give you anything?
15     A. Closest that would come to would be the UCC
16 Code Financing Statement attached.
17     Q. Who prepared that?
18     A. I do not know that.
19     Q. Did he tell you?
20     A. I don't recall that.
21     Q. Did he give that to you on or about the date
22 in January of, looks like January 12th, 1999?
23     A. I believe it was several days later. If you
24 look at the top of the page the fax is printed January
25 14th.

137

1      Q. Do you recognize at the top there's a
2  reference there to Interpipe? Do you see that?
3      A. I do see that.
4      Q. Do you recall what that refers to?
5      A. I do not.
6      Q. Do you know who sent that fax to you?
7      A. I believe Mr. Shell did.
8      Q. Your brother's signature is dated the day
9  before yours, right?
10     A. Yes, that would be correct.
11     Q. Did he sign that in your presence?
12     A. No, he did not, I don't believe.
13     Q. Was he present in Arizona when you signed the
14 agreement?
15     A. No, he was not.
16     Q. Do you know if he signed the agreement in
17 Arizona?
18     A. I know he did not.
19     Q. Do you believe he signed it in St. Louis?
20     A. No.
21     Q. Where was he when he signed this as far as
22 you know?
23     A. I believe he signed that in New Hampshire
24 where he used to live.
25     Q. Did you understand that the term "equity